******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMES E. BURNS, JR. *v.* DAVID Y. ADLER ET AL.
(SC 19560)
(SC 19561)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa, Robinson and
Vertefeuille, Js.

*Argued November 8, 2016—officially released March 28, 2017*

*David N. Rosen*, with whom, on the brief, was *Steven
D. Ecker*, for the appellant in SC 19560, appellee in SC
19561 (named defendant).

*William C. Franklin*, for the appellee in SC 19560,
appellant in SC 19561 (plaintiff).

*Opinion*

ROGERS, C. J. The primary issue that we must resolve in this certified appeal is whether the bad faith exception to the bar on the enforcement of home improvement contracts that do not comply with the Home Improvement Act (act), General Statutes § 20-418 et seq., entitled the plaintiff contractor, James E. Burns, Jr., to recover damages from the defendant homeowner, David Y. Adler,[1] for home improvement services despite the plaintiff's noncompliance with that statute. The parties entered into an agreement whereby the plaintiff agreed to furnish materials and supply labor in connection with the renovation of a residence owned by the defendant in the town of Salisbury. After the renovation project was largely complete, a dispute arose regarding amounts that the defendant owed the plaintiff for services performed. Thereafter, the plaintiff brought this action claiming, among other things, breach of contract and unjust enrichment. The defendant raised the special defense that the plaintiff's claims were barred because the agreement did not comply with the requirements of General Statutes (Rev. to 2007) § 20-429.[2] In turn, the plaintiff claimed that the defendant was precluded from relying on § 20-429 because his refusal to pay the plaintiff was in bad faith. After a trial to the court, the trial court concluded that the plaintiff had incurred damages in the amount of $214,039 and that § 20-429 did not bar recovery because the defendant's refusal to pay was in bad faith. Accordingly, the court rendered judgment for the plaintiff in the amount of $214,039. The defendant appealed to the Appellate Court, which affirmed the judgment of the trial court. See *Burns* v. *Adler*, 158 Conn. App. 766, 808, 120 A.3d 555 (2015). We then granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did . . . § 20-429 (f) abrogate the bad faith exception to the [act] created in *Habetz* v. *Condon*, 224 Conn. 231, 240, 618 A.2d 501 (1992)?"; and (2) "Did the Appellate Court properly affirm the judgment of the trial court in favor of the plaintiff?" *Burns* v. *Adler*, 319 Conn. 931, 125 A.3d 205 (2015); see also footnote 7 of this opinion. We conclude that the first certified question is not reviewable because it was not raised in the trial court. We further conclude that the defendant did not act in bad faith and, therefore, the Appellate Court improperly affirmed the judgment of the trial court on the ground that the plaintiff was barred from invoking the protection of the act. Accordingly, we reverse the judgment of the Appellate Court and conclude that the case must be remanded to the trial court with direction to render judgment for the defendant.

The record reveals the following facts, which are undisputed or were found by the trial court, and procedural history. In September, 2007, the plaintiff, who is a self-employed construction worker, and the defendant

entered into negotiations regarding the renovation and remodeling of a weekend residence that the defendant was planning to buy in the town of Salisbury. The work was to include substantial demolition of the existing structure, the addition of a second floor and the expansion of the structure's footprint. The defendant wanted the work to be performed as quickly as possible so that he and his family could use the residence during the summer of 2008. The parties discussed a cost of approximately $400,000.

Pursuant to these discussions, the plaintiff prepared a written "Home Improvement Service Agreement" (agreement) dated October 5, 2007. The agreement described the services that the plaintiff was to perform as "begin demolition [of] existing home in preparation of planned remodel." The agreement also provided that "[a]ny modifications or changes to the above described scope of services shall be set forth in a *written* [c]hange [o]rder *signed by both parties*." (Emphasis in original.) In addition, the agreement provided that the defendant would pay the plaintiff "[$45] per man plus any expenses to include dumpsters [and/or] materials." The agreement further provided that "once full plans have been provided we will start another contract with firm pricing for every aspect of [the] job with the exclusion of any changes as the project progresses." The trial court concluded that the agreement did not satisfy the requirements of § 20-249 (a) or (f) because it was not signed by the plaintiff, it did not contain a completion date and the plaintiff failed to prove that he delivered a completed copy of it to the defendant.[3]

From October, 2007 through September, 2008, the plaintiff worked exclusively on the defendant's renovation project. During that period, the plaintiff received numerous work orders related to the project from multiple sources, including the defendant, his wife, Amie R. Weitzman, the defendant's architect, Elizabeth Slotnick, and Weitzman's assistant, Julie Weiner. None of these four people had a complete understanding of the work that the plaintiff was being requested to perform. In addition, none of them ever inquired about the cost of doing the various items of work that they requested. The written plans for the project were frequently revised by the defendant and others acting on his behalf, and many of the changes were significant. Indeed, the trial court found that the "project was marked by untrammeled profligacy on the part of the [defendant]."[4] According to the plaintiff, he continued to rely on the time and materials provision of the agreement and never executed a "contract with firm pricing," as provided by the agreement, because he never received a full set of plans and "things constantly changed from day to day . . . ."

As the project moved forward, the plaintiff periodically requested payments from the defendant, which the defendant provided. The plaintiff did not send the

defendant itemized bills, however, and the defendant initially did not request them. Rather, the plaintiff calculated his expenses from his checkbook records, invoices and time sheets.[5] The plaintiff did not retain all invoices and time sheets relating to the project, nor did he keep a daily construction log or other records that would show which tradesmen were on the site, what work was performed, or what materials were delivered to the site.

On March 15, 2008, the plaintiff presented the defendant with a written budget report showing that the projected total cost of the project was $810,267, including $521,944 for work already completed. On March 25, 2008, the plaintiff presented the defendant with a revised budget report showing that the projected total cost of the project was $795,038, including $518,352 for work already completed. On May 27, 2008, the plaintiff informed the defendant by e-mail that the budget had increased to $886,954, not including certain additional items that the defendant had requested. The e-mail stated that "all future changes will be done on a time and material basis unless it is more efficient to bid," and that "[t]here will . . . be a need for an [e-mail] or written response for these changes from either you or your wife's office approving them . . . ." The plaintiff also told the defendant that he owed substantial amounts to his subcontractors and required additional funding to keep them working. The defendant was unhappy with the revised budget, but he chose to retain the plaintiff as his contractor because he was anxious to have the project completed so that he could use the house. Although the defendant contended that he believed that the e-mail represented the terms of a new "fixed price contract," he and Weitzman continued to ask the plaintiff to perform additional tasks.

On August 25, 2008, the plaintiff sent a letter to the defendant setting forth the "final numbers for all work performed" at the residence. The plaintiff stated that the total cost of the project was $1,188,350 and that payments received to date totaled $985,000, for a balance due of $203,350.[6] At that point, the project was approximately 98 percent complete. In response, the defendant sent an e-mail to the plaintiff on September 3, 2008, summarizing and comparing the various budget reports that the plaintiff had provided. The defendant complained that "the numbers do not add up and there are different categories being created in each budget." According to the defendant's calculations, the total cost of the project was $963,923, or $21,077 less than the $985,000 that the defendant had already paid. The $963,923 figure included extra items of work that the defendant had approved since the plaintiff's May 27, 2008 budget report. The defendant indicated that he was willing to pay for these extras if the plaintiff could establish that the amounts shown were correct, and he requested additional information for certain items. The

defendant also noted that the plaintiff had not begun to address "the 100+ item punch list" that the defendant had provided to the plaintiff. Finally, the defendant stated that he had been "very happy with the quality of [the plaintiff's] work generally and it is my hope that we can resolve this matter amicably."

On September 8, 2008, the plaintiff informed the defendant that the total cost of the project had increased to $1,199,911, and the total balance due was $214,911. On September 12, 2008, the plaintiff sent an e-mail to the defendant itemizing in detail the work that he and others had been performing at the residence since June 1, 2008. The plaintiff, however, did not provide the cost of each item or any backup documentation. The plaintiff stated that he had performed the work at the defendant's request on the understanding that he would be paid for it. He also stated that he was losing money on the project, that his relationships with his subcontractors and suppliers were in jeopardy, and that he needed to pay them.

On September 9, 2008, the defendant's architect, Slotnick, sent an e-mail to the defendant indicating that she had received an e-mail from a supplier inquiring whether the defendant was happy with the kitchen cabinetry, because he had not been paid yet. Slotnick had told the supplier that the plaintiff and the defendant had financial issues that they were attempting to resolve. In response, the defendant sent an e-mail to Slotnick asking if she could recommend "a good attorney who does this kind of work."

On September 16, 2008, the defendant informed the plaintiff by e-mail that "[w]e are at the end of the road." The defendant stated that the plaintiff's explanations of the additional charges after the May 27, 2008 budget report "were neither itemized, nor specific, and in my opinion are wholly inadequate . . . ." Accordingly, the defendant concluded that he did not owe the plaintiff any amount beyond the $985,000 that he had already paid, which included payment for all extra work performed after May 27, 2008, of which the defendant was aware. The defendant also stated that he was going to hire a contractor to complete the punch list items and that he was "officially and immediately terminating [the] relationship." Finally, the defendant stated that, if the plaintiff intended to litigate the matter in court, the defendant, who is an attorney, would represent himself, and he strongly believed that he would prevail. The defendant admitted at trial that the statement that he would represent himself was false and that he made it in the hope that the plaintiff would not bring a lawsuit if he knew that he would incur litigation expenses that the defendant would not incur.

In response to the defendant's September 16, 2008 e-mail, the following day the plaintiff sent an e-mail to the defendant stating, "[I] would like to finish the punch

list. It is my respons[i]bility to complete the work." The plaintiff also asked whether his subcontractors would be paid. On September 24, 2008, the defendant sent an e-mail to the plaintiff inquiring when he would be able to complete the punch list. The defendant explained to the plaintiff that, "unless an item is highlighted on the punch list in yellow, these items are included in the amounts I have paid you to date . . . ." On October 10, 2008, the defendant sent another e-mail to the plaintiff stating that, although the plaintiff had indicated that he wanted to complete the punch list, the defendant had "only seen modest progress . . . ." Accordingly, the defendant was going to hire a contractor to complete the work. In addition, the defendant stated that, in light of the fact that he had received a notice of the plaintiff's intent to file a mechanic's lien on the residence, the plaintiff was no longer permitted to enter the defendant's premises.

On October 10, 2008, the plaintiff filed a certificate of mechanic's lien in the amount of $214,039.09 on the defendant's property. According to the certificate of mechanic's lien, the "last day substantial services were performed relative to the work done by [the plaintiff] was August 29, 2008."

Thereafter, the plaintiff brought this action against the defendant seeking foreclosure of his mechanic's lien (first count),[7] and claiming damages for breach of contract (second count) and unjust enrichment (third count). The defendant raised the special defense that, because the plaintiff had failed to comply with § 20-429, the agreement was unenforceable. In his reply in avoidance, the plaintiff contended that the agreement complied with the provisions of § 20-429 or, in the alternative, if the agreement was noncompliant, he could seek restitution from the defendant because the defendant's reliance on § 20-429 was in bad faith.

The matter was tried to the court, which concluded that the agreement did not comply with the requirements of § 20-429, but that the plaintiff could nevertheless recover damages from the defendant because the defendant had acted in bad faith. In support of this conclusion, the trial court found that the defendant and others had made numerous requests for extra work without inquiring as to the expense, that the defendant was aware that the plaintiff owed significant debts to his subcontractors and suppliers, and that the defendant terminated the contract between the parties, but then continued to ask the plaintiff to work on the project without any intention of making further payments. The court further found that the defendant "unilaterally and arbitrarily selected a price that he was willing to pay for the project." The court reasoned that, because the defendant knew as of August 4, 2008, when he made his final payment, that the project was "largely complete," he must have believed that the project itself

would not be at risk if he made no further payments even if he "could not trick the plaintiff into finishing the entire punch list . . . ."[8] The trial court also found that the defendant knew that his failure to pay the plaintiff "created a serious risk of putting the plaintiff out of business," and that he "took advantage of [this] fact" to induce the plaintiff to continue to work for him by suggesting that he might make further payments, even though he had no intention of doing so.[9] The defendant increased the pressure for the plaintiff to complete the work when the defendant stated falsely that he would represent himself if the plaintiff brought an action, thereby reminding the plaintiff that, unlike the defendant, he would have to bear legal expenses. The trial court acknowledged, however, that another contractor ultimately completed most of the work that remained to be done after August 4, 2008.

The trial court also acknowledged that "the plaintiff's billing records were poorly maintained" and that "much of the difficulty in preparing the case for trial, trying this case and determining the appropriate resolution of the dispute can be traced directly to the plaintiff's failure to maintain better records. Indeed, the existence of the lawsuit itself is undoubtedly tied to the plaintiff's administrative shortcomings. Just as the parameters of the renovation project [were] a constantly moving target, the precise calculation of the plaintiff's expenses was a difficult exercise, the correct resolution of which is a matter upon which the parties vehemently disagree."

On the basis of these findings, the trial court concluded that the defendant's conduct "constituted a design to mislead and/or deceive the plaintiff." Specifically, the court concluded that the defendant's "decision to make no further payments after August 4, 2008, was not prompted by an honest mistake as to his rights or duties. Instead, this decision was the product of [the defendant's] desire to use the plaintiff to finish the project at no further expense to [the defendant]." In addition, the court concluded that the defendant's course of conduct "was the product of [the defendant's] choosing to serve his own financial interests at the plaintiff's expense." Accordingly, the trial court concluded that the plaintiff was entitled to recover damages from the defendant, notwithstanding the fact that the agreement did not meet the requirements of § 20-429, because the defendant's refusal to pay the amounts due to the plaintiff was in bad faith. The court rendered judgment for the plaintiff in the amount of $214,039.09 on his breach of contract claim.[10] The court also rendered judgment for the plaintiff on all of the defendant's counterclaims. See footnote 2 of this opinion.

The defendant appealed from the judgment of the trial court to the Appellate Court, claiming that the bad faith exception to § 20-429 that this court adopted in

*Habetz* v. *Condon*, supra, 224 Conn. 240, has been abrogated by the enactment of § 20-429 (f). *Burns* v. *Adler*, supra, 158 Conn. App. 792. The defendant further claimed that, even if the bad faith exception still exists, the trial court incorrectly determined that he acted in bad faith because "the only situation in which a homeowner can be found to have invoked the act in bad faith to defeat a contractor's claim for payment for work performed without an act-compliant contract is when he does so to avoid paying for services he accepted with knowledge of the act and its requirements and the intent not to pay for them by later invoking the act." Id. Finally, the defendant claimed that, even under a broader bad faith standard, the plaintiff failed to prove that the defendant acted in bad faith because the evidence showed only that the defendant refused to pay the plaintiff as the result of a good faith billing dispute. Id., 801–802. The Appellate Court concluded that it was bound to reject the claim that the bad faith exception has been legislatively abrogated pursuant to its decision in *Walpole Woodworkers, Inc.* v. *Manning*, 126 Conn. App. 94, 104, 11 A.3d 165 (2011), aff'd, 307 Conn. 582, 57 A.3d 730 (2012), in which it had held to the contrary. *Burns* v. *Adler*, supra, 792. The Appellate Court also rejected the defendant's claims that the trial court incorrectly determined that he had acted in bad faith. Id., 801–802, 805. Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 808.

This appeal followed. The defendant claims on appeal that this court should overrule the Appellate Court's holding in *Walpole Woodworkers, Inc.* v. *Manning*, supra, 126 Conn. App. 105, that the legislature did not abrogate the bad faith exception to the act when it amended § 20-429 to include subsection (f). See Public Acts 1993, No. 93-215, § 1. The defendant further contends that, if the bad faith exception to the act still exists, the Appellate Court improperly affirmed the judgment of the trial court that he acted in bad faith because the plaintiff failed to establish that: (1) there was any causal connection between the plaintiff's losses and the purported acts of bad faith; (2) the defendant was aware of his right to repudiate the contract under the act when he disputed the plaintiff's bill; or (3) the defendant had no reasonable basis to dispute the plaintiff's bill.

I

We first address the defendant's claim that the legislature's enactment of § 20-429 (f) abrogated the judicially created rule that a homeowner may not avail himself of the protection of the act if the homeowner invokes § 20-429 (a) in bad faith. See *Habetz* v. *Condon*, supra, 224 Conn. 237. The plaintiff contends that this claim is unreviewable because it was unpreserved.[11] The defendant concedes that he did not raise this claim in the

trial court, but contends that the claim is nevertheless reviewable because, in light of the Appellate Court's holding in *Walpole Woodworkers*, *Inc.* v. *Manning*, supra, 126 Conn. App. 105, that § 20-429 (f) did not abrogate the bad faith exception, raising the claim would have been futile. We disagree.

This court previously has rejected "the proposition that the futility of asking the trial court to overrule a decision of this court automatically excuses the failure to preserve the claim. Moreover, we [have concluded] that there are good reasons not to adopt such a rule. First, requiring the party to raise the claim would put the other parties on notice of the claim and allow them to properly evaluate their position at the time of trial. . . . Second, a futility exception to preservation could lead to ambuscade of the trial court." (Citation omitted; footnote omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 428– 29, 78 A.3d 76 (2013). Thus, although the futility of raising a claim is a factor that this court will consider when determining whether it will review an unpreserved claim, the general rule is that futility will not excuse the failure to raise a claim in the trial court in the absence of exceptional circumstances. See id. We find no such exceptional circumstances here. Indeed, the Appellate Court did not release its decision in *Walpole Woodworkers*, *Inc.*, until January 18, 2011, *after* the pleadings in this case were already closed. Thus, the defendant had no reason to believe at the time that the plaintiff filed his reply in avoidance alleging bad faith that it would be futile to file a motion to strike that pleading, yet he failed to do so. Accordingly, we conclude that this claim is not reviewable.

II

We next address the defendant's claim that the Appellate Court improperly affirmed the trial court's conclusion that the defendant acted in bad faith when he refused to pay the plaintiff the amounts that the plaintiff claimed were due. We agree.

We begin our analysis with the standard of review. This court previously has held that the question of whether a party acted in bad faith is a question of fact subject to review for clear error. *Habetz* v. *Condon*, supra, 224 Conn. 237 n.11 ("[i]t is the burden of the party asserting the lack of good faith to establish its existence and whether that burden has been satisfied in a particular case is a question of fact"). In *Habetz*, however, the plaintiff homeowner did not challenge on appeal the trial court's conclusion that the defendant contractor had met his burden of proving bad faith. Id. Thus, this court was not required to consider the proper standard of review when the underlying facts are not disputed, but the homeowner claims that those facts do not rise to the level of bad faith. We now conclude that whether undisputed facts meet the legal standard of bad faith is a question of law.[12] See *Francis* v. *Dept.*

*of Correction*, 178 Wn. App. 42, 51–52, 313 P.3d 457 (2013) ("[w]hether an agency acted in bad faith . . . presents a mixed question of law and fact, in that it requires the application of legal precepts [the definition of 'bad faith'] to factual circumstances [the details of the agency's conduct]"), review denied, 180 Wn. 2d 1016, 327 P.3d 55 (2014); *Brown* v. *Labor & Industry Review Commission*, 267 Wis. 2d 31, 40, 671 N.W.2d 279 (2003) (determination of bad faith presents mixed question of fact and law); see also *Walpole Woodworkers, Inc.* v. *Manning*, 307 Conn. 582, 588, 57 A.3d 730 (2012).

In the present case, we assume the correctness of the trial court's factual findings that: the defendant and others had made numerous requests for extra work without inquiring as to the expense; the defendant was aware that the plaintiff owed significant debts to his subcontractors and suppliers; the defendant terminated the contract between the parties, but then continued to allow the plaintiff to work on the project because he wanted to finish the project at no further expense to himself; the defendant unilaterally and arbitrarily selected the price that he was willing to pay the plaintiff; the defendant knew that his failure to pay the plaintiff would jeopardize the plaintiff's business; and the defendant intended to pressure the plaintiff to complete the work by suggesting that he might make further payments and that, if the plaintiff brought an action against the defendant, the defendant would represent himself. Because we treat the trial court's factual findings as correct, whether this conduct rose to the level of bad faith for purposes of the bad faith exception to § 20-429 is a pure question of law, subject to plenary review.

We turn, therefore, to a review of the relevant law. In *Habetz* v. *Condon*, supra, 224 Conn. 239, we recognized that the purpose of the act is "to preclude a contractor's recovery on the various restitutionary doctrines so as to effectuate the legislative purpose: to require that contractors comply with the act. . . . Clearly, the legislature is entitled, in the first instance, to impose the burden of compliance with the statute on the professional, the contractor, rather than on the nonprofessional, the consumer. . . . The objective of the act is to promote understanding by the consumer, to ensure his ability to make an informed decision and to protect him from substantial work by an unscrupulous contractor." (Citations omitted; internal quotation marks omitted.) We further concluded, however, that the act did not "override the general principle embodied in the bad faith exception: that an individual should not profit from his own deceptive and unscrupulous conduct." Id., 239–40. Thus, "[p]roof of bad faith . . . serves to preclude the homeowner from hiding behind the protection of the act."[13] Id., 237.

We stated in *Habetz* that "[b]ad faith in general

implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) Id.

In the present case, the defendant contends that the Appellate Court improperly affirmed the trial court's finding of bad faith because a homeowner does not act in bad faith unless the homeowner "accepts the contractor's services knowing that he has an 'escape hatch' under the [act] which allows him to avoid payment for those services." See *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 248, 618 A.2d 506 (1992) (trial court properly found that plaintiff had not proven bad faith when there was no "proof that the attorneys intentionally [drafted a noncompliant contract] in order to have an escape hatch").[14] Thus, the defendant claims that the bad faith exception does not apply unless the contractor detrimentally relied on the homeowner's preexisting bad faith conduct when providing services pursuant to a noncompliant contract.

We conclude that the bad faith exception to the bar on a contractor's recovery under contracts that do not comply with § 20-429 does not apply when a homeowner receives goods and services from a contactor in the belief that they ultimately will have to be paid for, but then repudiates the contract because the contractor's noncompliance with the act gave rise to a genuine, good faith dispute about the scope of the work or the contract price.[15] As we have explained, the very purpose of the act is to place the burden *on the contractor* to provide written documentation, signed by both parties, for "[e]ach change in the terms and conditions of a contract . . . ." General Statutes § 20-429 (a) ("[e]ach change in the terms and conditions of a contract shall be in writing and shall be signed by the owner and contractor"); see also *Habetz* v. *Condon*, supra, 224 Conn. 239 ("[c]learly, the legislature is entitled, in the first instance, to impose the burden of compliance with [§ 20-429 (a)] on the professional, the contractor, rather than on the nonprofessional, the consumer" [internal quotation marks omitted]). When a contractor fails to meet this burden and, as a result, a genuine, good faith dispute about the authorized scope of the work or the contract price arises, the homeowner's refusal to pay the amounts claimed by the contractor is not in bad faith. Rather, under these circumstances, the inability of a contractor to enforce the homeowner's payment obligation is exactly what the act contemplates, even as to work that the contractor actually performed. See *Barrett Builders* v. *Miller*, 215 Conn. 316, 326–27, 576 A.2d 455 (1990) (although bar on recovery may be "a harsh result where a contractor in good faith but in

ignorance of the law performs valuable home improvements without complying with § 20-429 . . . the legislature could legitimately view as more urgent the need to protect consumers from unscrupulous contractors than the need to protect innocent contractors from manipulative consumers"); see also *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 224 Conn. 249 ("[t]here is nothing dishonest or sinister about homeowners proceeding on the assumption that there is a valid contract, enforcing its provisions, and later, in defense to a suit by the contractor, upon learning that the contract is invalid, then exercising their right to repudiate it"); *New England Custom Concrete, LLC* v. *Carbone*, 102 Conn. App. 652, 661, 927 A.2d 333 (2007) (when, "[a]t best, the record demonstrates vigorous disagreement about the quality of the [plaintiff contractor's] workmanship in performing the contract," it was "doubtful that the [trial] court *could* have made a finding of bad faith" [emphasis in original]); *Kronberg Bros., Inc.* v. *Steele*, 72 Conn. App. 53, 63, 804 A.2d 239 (when trial court found no evidence that defendant homeowners were responsible for defects in contract and plaintiff contractor's allegations of bad faith "arose out of the deteriorating relationship between the parties" such that defendants "were confronted with what must have been an exasperating ordeal," court properly concluded that plaintiff failed to prove that defendants acted in bad faith [internal quotation marks omitted]), cert. denied, 262 Conn. 912, 810 A.2d 277 (2002). Indeed, it would completely nullify the core purpose of the act to conclude that, if the contractor ultimately is able to establish the value of the work that he actually performed, it is in bad faith for a homeowner to refuse to pay the contractor, even though the contractor failed to document the work and any concomitant change in price in a writing, signed by both parties, and even though his failure to comply with § 20-429 initially gave rise to a genuine dispute about the authorized scope or actual value of the work. See *Habetz* v. *Condon*, supra, 239 ("[t]he objective of the act is to promote understanding by the consumer, to ensure his ability to make an informed decision and to protect him from substantial work by an unscrupulous contractor").

In the present case, the trial court made no finding, and the plaintiff points to no evidence that would support a finding, that the defendant knew before August 4, 2008, when the project was largely complete, that he had an "escape hatch" to avoid payment for the goods and services that he was receiving.[16] See *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 224 Conn. 248 (trial court properly found that plaintiff had not proven bad faith when there was no "proof that the [defendant homeowners'] attorneys intentionally [drafted a noncompliant contract] in order to have an escape hatch"). Indeed, there is no evidence that the defendant had any reason to believe as of August 4, 2008, that he had

received goods and services for which he had not paid. Rather, the undisputed evidence shows that, as of May 27, 2008, the last date that the plaintiff provided a contract price to the defendant, the plaintiff estimated that the price to complete the project would be $886,954, not including certain items that the defendant had requested, and that, as of August 4, 2008, the defendant had paid the plaintiff $985,000. Although the defendant continued to ask the plaintiff to perform extra work between May 27, 2008, and August 4, 2008, the trial court did not find, and the plaintiff has cited no evidence that would support a finding, that the defendant knew or should have known that this extra work would raise the contract price from $886,954 to $1,199,911, an increase of $312,957, or 35 percent, in little more than two months. Indeed, the only evidence regarding the defendant's beliefs on this issue is the defendant's September 3, 2008 e-mail to the plaintiff indicating that, according to the defendant's calculations, the total cost of the project, including extras that he had approved since May 27, 2008, was $963,923, $21,077 less than he had already paid the plaintiff, and the defendant's September 16, 2008 e-mail to the plaintiff stating that he had already paid for all of the extra work performed after May 27, 2008, of which he was aware.[17] Thus, the defendant's conduct before August 4, 2008, could not have been in bad faith.

We further conclude that the defendant's repudiation of the contract after he made his final payment to the plaintiff on August 4, 2008, was not in bad faith. The trial court expressly found that "the plaintiff's billing records were poorly maintained," that "much of the difficulty in preparing the case for trial, trying this case and determining the appropriate resolution of the dispute can be traced directly to the plaintiff's failure to maintain better records," and that these "administrative shortcomings" caused the breakdown of the relationship between the parties that, in turn, led to the defendant's termination of the contract and the plaintiff's legal action. Although the trial court found that, "when [the defendant] made his final payment on August 4, 2008, he had no intention of ever making any further payments," and that the defendant "unilaterally and arbitrarily" decided how much he would pay the plaintiff, the court made no finding, and the plaintiff has cited no evidence that would support a finding, that the defendant knew or should have known that the plaintiff's calculations of the amounts owed to him were correct, or even close to correct.[18] The only documents that the plaintiff provided to the defendant after August 4, 2008, were mutually inconsistent lists of work items and prices that were not supported by invoices, receipts, checks or time sheets.[19] Indeed, the trial court expressly acknowledged that "the parties vehemently disagree" about the amounts that are owed to the plaintiff and that the plaintiff's poor record keeping made

it difficult, if not impossible, to determine the precise amounts that he was owed *even after trial*, where the plaintiff had presented extensive documentation of his expenses that he previously had not provided to the defendant. Thus, it is implicit in the trial court's factual findings that the plaintiff's noncompliance with the act gave rise to a genuine, good faith disagreement between the parties as to whether the defendant owed the plaintiff the amounts that the plaintiff claimed. Moreover, even if there were no genuine dispute about the value of the goods and services that the plaintiff actually provided, the plaintiff's failure to comply with the act deprived the defendant of the opportunity to make an informed decision as to whether he should continue to accept goods and services from the plaintiff during the course of the renovation project, which is the core purpose of the act.[20] See *Habetz* v. *Condon*, supra, 224 Conn. 239. Finally, the fact that the defendant paid almost $1,000,000 to the plaintiff on a project that was initially estimated to cost $400,000, despite the plaintiff's failure to document the cost of the goods and services that he provided, strongly suggests that the defendant did not act in bad faith.

To the extent that the trial court concluded that the defendant acted in bad faith when he continued to allow the plaintiff to perform work after August 4, 2008, at which point he had decided that he would make no further payments, we disagree. The trial court made no factual findings as to what items of work the plaintiff performed after that date, nor did it make any findings as to when the plaintiff billed the defendant for those items of work, and the plaintiff has cited no evidence that could provide the basis for such findings. Thus, there is simply no way of knowing whether the defendant believed in good faith that he already had paid the plaintiff for the small amount of work that the plaintiff performed after August 4, 2008,[21] and it clearly would not be in bad faith for the defendant to allow the plaintiff to finish work for which the defendant believed that he had already paid. Moreover, it is clear that the defendant's September 3, 2008 e-mail indicating that he was prepared to pay for extra items of work if the plaintiff could establish that the amounts he claimed were correct did not induce the plaintiff to perform substantial additional work, because, according to the mechanic's lien that the plaintiff prepared and placed on the property, "[t]he last day [that] substantial services were performed" on the project was August 29, 2008.[22]

Because the trial court did not find, and the evidence would not support a finding, that the defendant received goods and services from the plaintiff with the intent of invoking § 20-429 to avoid paying for them, and because the trial court found that the plaintiff's failure to comply with the requirements of § 20-429 (a) gave rise to a genuine dispute about the value of those goods and services, we conclude that the defendant did not act in

bad faith when he invoked that statute as a bar to the plaintiff's enforcement action. Accordingly, we conclude that the Appellate Court improperly affirmed the judgment of the trial court that the plaintiff was entitled to recover damages from the defendant notwithstanding the fact that the agreement between the parties did not comply with § 20-429.

The judgment of the Appellate Court is reversed in part and the case is remanded to that court with direction to remand the case to the trial court with direction to render judgment for the defendant on the first and second counts of the plaintiff's complaint; the plaintiff's appeal from the Appellate Court affirming the trial court's denial of his request for attorney's fees is dismissed as moot.

In this opinion PALMER, EVELEIGH, McDONALD and VERTEFEUILLE, Js., concurred.

[1] The plaintiff's complaint also named as defendants Adler's wife, Amie R. Weitzman, and the Salisbury Bank and Trust Company (bank), which held a mortgage on the defendant's residence. The trial court concluded that Weitzman was not liable to the plaintiff, and the plaintiff has not challenged that conclusion on appeal. The bank's interest in this action also is not at issue in this appeal. Accordingly, hereinafter all references to the defendant are to Adler.

[2] General Statutes (Rev. to 2007) § 20-429 provides in relevant part: "(a) No home improvement contract shall be valid or enforceable against an owner unless it: (1) Is in writing, (2) is signed by the owner and the contractor, (3) contains the entire agreement between the owner and the contractor, (4) contains the date of the transaction, (5) contains the name and address of the contractor and the contractor's registration number, (6) contains a notice of the owner's cancellation rights in accordance with the provisions of chapter 740, (7) contains a starting date and completion date, and (8) is entered into by a registered salesman or registered contractor. Each change in the terms and conditions of a contract shall be in writing and shall be signed by the owner and contractor, except that the [C]ommissioner [of Consumer Protection] may, by regulation, dispense with the necessity for complying with the requirement that each change in a home improvement contract shall be in writing and signed by the owner and contractor. . . .

"(f) Nothing in this section shall preclude a contractor who has complied with subdivisions (1), (2), (6), (7) and (8) of subsection (a) of this section from the recovery of payment for work performed based on the reasonable value of services which were requested by the owner, provided the court determines that it would be inequitable to deny such recovery."

Section 20-429 was amended subsequent to the time the parties entered into their agreement. See Public Acts 2009, No. 09-18, § 2; Public Acts 2016, No. 16-35, § 3. All references herein to § 20-429 are to the 2007 revision of the statute.

The defendant also brought a four count counterclaim against the plaintiff alleging a violation of the Connecticut Unfair Trade Practices Act; General Statutes § 42-110a et seq.; negligence, breach of contract and unjust enrichment. The trial court rendered judgment in favor of the plaintiff on the defendant's counterclaims, and the defendant has not challenged that ruling in this certified appeal.

[3] The defendant signed the agreement on October 9, 2007, but he also inadvertently signed three form notices of cancellation that had been attached to the agreement. On October 10, 2007, the defendant sent an e-mail to the plaintiff explaining that his assistant had printed out the agreement and the attachments, and that he had "just signed everything." In response, the plaintiff requested a new copy of the agreement or a letter explaining that the original agreement was still in effect. The defendant never complied with this request. According to the plaintiff, he gave a signed copy of the agreement to the defendant, but no such document was presented as evidence at trial and the defendant denied that he received an executed agreement.

[4] The trial court found, for example, that the defendant or others acting

on his behalf had directed the plaintiff to assemble furniture, roll up rugs, put mattresses on beds, mow the lawn, remove brush, chop firewood, shop for a wine refrigerator and an oven hood vent, and perform other "tasks that do not normally fall to a contractor."

[5] The plaintiff points to no evidence that he ever provided any of these records to the defendant in support of his requests for payment before bringing this action.

[6] The trial court found that the defendant made his last payment to the plaintiff on August 4, 2008, at which time the project was "largely complete."

[7] The parties agreed that the foreclosure claim would be bifurcated from the plaintiff's other claims and would be addressed in a separate hearing, if necessary, after trial. After the trial court rendered judgment in favor of the plaintiff on his breach of contract claim, he moved for a supplemental judgment seeking foreclosure of the mechanic's lien. The parties then stipulated that there was no need for a hearing on the terms of the judgment of foreclosure. Accordingly, the trial court rendered a judgment of strict foreclosure without a hearing, and the defendant filed an amended appeal to the Appellate Court from that ruling. The trial court denied the plaintiff's request for attorney's fees because, under General Statutes § 52-249, a hearing as to the form of judgment is a condition precedent to an award of attorney's fees in a foreclosure action. The plaintiff filed a separate appeal to the Appellate Court challenging the trial court's denial of his request for attorney's fees, and the Appellate Court affirmed that ruling. See *Burns* v. *Adler*, supra, 158 Conn. App. 808. We then granted the plaintiff's request for certification to appeal from the judgment of the Appellate Court limited to the following issue: "Did the Appellate Court correctly affirm the judgment of the trial court denying the plaintiff's request for attorney's fees pursuant to . . . § 52-249 (a)?" *Burns* v. *Adler*, 319 Conn. 931, 932, 125 A.3d 206 (2015). Because we are reversing the judgment of the Appellate Court affirming the judgment in favor of the plaintiff on his breach of contract claim and directing a judgment in favor of the defendant on that claim, we also reverse the judgment of strict foreclosure and direct judgment in favor of the defendant on that claim. Accordingly, the plaintiff's certified appeal from the ruling of the Appellate Court affirming the trial court's denial of his request for attorney's fees is dismissed as moot.

[8] The trial court also found, however, that the defendant induced the plaintiff to finish the project because that approach would be "faster, more efficient and vastly more economical than concluding the relationship with the plaintiff and retaining a new contractor." It is difficult to reconcile the trial court's finding that the defendant believed that the project would not be at risk if he stopped paying the plaintiff because it was largely complete with its finding that the defendant believed that it would be "vastly more economical" to induce the plaintiff to complete the project than to retain a new contractor.

[9] The trial court was apparently referring to the defendant's September 3, 2008 e-mail to the plaintiff indicating that he was willing to pay for extra items of work that he had approved if the plaintiff could establish that the amounts he claimed for the items were correct.

[10] The trial court did not expressly address the plaintiff's claim of unjust enrichment. In *Walpole Woodworkers*, *Inc.* v. *Manning*, 126 Conn. App. 94, 102, 11 A.3d 165 (2011), aff'd, 307 Conn. 582, 57 A.3d 730 (2012), the Appellate Court concluded that, "under the bad faith exception, the plaintiff is entitled only to recover the value of the work performed because the contract is otherwise unenforceable due to the plaintiff's violation of the act." In other words, when a contractor has proved bad faith, he may recover only under a theory of unjust enrichment, not breach of contract. Thus, although the parties have not raised the issue, it is unclear to us why the trial court, which cited *Walpole Woodworkers*, *Inc.*, in its memorandum of decision, rendered judgment for the plaintiff on his breach of contract claim instead of his claim for unjust enrichment. We note, however, that this court concluded in *Walpole Woodworkers*, *Inc.* v. *Manning*, 307 Conn. 582, 590, 57 A.3d 730 (2012), that, when a homeowner has invoked § 20-429 in bad faith, "the contract price is evidence of the reasonable value of the benefit the defendant received from the plaintiff." Accordingly, it is reasonable to presume that any error in rendering judgment for the plaintiff on his breach of contract claim and awarding contract damages was harmless.

[11] The plaintiff raised this claim in his brief to the Appellate Court; see *Burns* v. *Adler*, Conn. Appellate Court Records & Briefs, January Term, 2015, Plaintiff's Brief p. 31; but the Appellate Court did not address the issue because, as we have indicated herein, the court disposed of the claim on

the ground that it was bound by its prior holding on that issue in *Walpole Woodworkers, Inc.* v. *Manning*, supra, 126 Conn. App. 105. See *Burns* v. *Adler*, supra, 158 Conn. App. 792.

[12] Although the dissent agrees with our conclusion that, when the facts are undisputed, whether those facts rise to the level of bad faith under the act is a question of law, it ultimately concludes that we are substituting our factual findings for the trial court's. As we discuss at length in the body of this opinion, however, we fully accept the trial court's factual findings and assume every inference in favor of a finding of bad faith. The *only* "finding" by the trial court with which we disagree is that court's ultimate conclusion that the defendant's conduct satisfied the legal standard for bad faith. Indeed, the dissent has not identified a single specific factual finding that we have ignored or rejected.

[13] In *Habetz*, the defendant did not dispute the trial court's finding that he had acted in bad faith. See *Habetz* v. *Condon*, supra, 224 Conn. 237 n.11. Thus, there was no occasion for this court to determine whether the facts of the case would support a finding of bad faith.

[14] See also *Lucien* v. *McCormick Construction, LLC*, 122 Conn. App. 295, 298–99, 998 A.2d 150 (2010) (under *Wadia Enterprises, Inc.*, bad faith exception did not apply when plaintiff homeowner did not dispute amounts owed or adequacy of defendant contractor's performance until homeowner made final payment and she failed to raise § 20-429 as defense to defendant's claim for payment until defendant brought action for payment); *New England Custom Concrete, LLC* v. *Carbone*, 102 Conn. App. 652, 661, 927 A.2d 333 (2007) (when, "[a]t best, the record demonstrates vigorous disagreement about the quality of the [plaintiff contractor's] workmanship in performing the contract," it was "doubtful that the [trial] court *could* have made a finding of bad faith" [emphasis in original]); *MacMillan* v. *Higgins*, 76 Conn. App. 261, 272–73, 822 A.2d 246 (attorney trial referee properly found that defendant homeowners had not acted in bad faith even though they had drafted contract and evidence showed that defendants and their agents were familiar with provisions of § 20-429), cert. denied, 264 Conn. 907, 826 A.2d 177 (2003); *Kronberg Bros., Inc.* v. *Steele*, 72 Conn. App. 53, 63, 804 A.2d 239 (when trial court found no evidence that defendant homeowners were responsible for defects in contract and plaintiff's allegations of bad faith "arose out of the deteriorating relationship between the parties" such that defendants "were confronted with what must have been an exasperating ordeal," court properly concluded that plaintiff failed to prove that defendants acted in bad faith [internal quotation marks omitted]), cert. denied, 262 Conn. 912, 810 A.2d 277 (2002); *Dinnis* v. *Roberts*, 35 Conn. App. 253, 259, 644 A.2d 971 (rejecting plaintiffs' claim that "the bad faith exception to the enforcement of the act is not limited to instances of bad faith relating to the formation of, or inducement to, enter into a home improvement contract"), cert. denied, 231 Conn. 924, 648 A.2d 162 (1994).

[15] In support of his claim to the contrary, the plaintiff relies on *Walpole Woodworkers, Inc.* v. *Manning*, supra, 126 Conn. App. 94. In that case, however, the Appellate Court concluded only that a homeowner's repudiation of a noncompliant contract constitutes bad faith when the work has been satisfactorily completed *and the contractor's noncompliance has not given rise to a genuine dispute about the scope of the work or the contract price*. See id., 101–102. Thus, the Appellate Court essentially held that a homeowner's repudiation of a contract pursuant to § 20-429 on the basis of a mere technical violation of the statute is in bad faith. We need not consider here whether that holding was correct, because the trial court implicitly found in the present case that the plaintiff's noncompliance with § 20-429 gave rise to a genuine dispute over the scope of the goods and services that were provided by the plaintiff and the total contract price, which is precisely what that act was intended to prevent.

[16] Indeed, the defendant testified at trial that he did not learn about his right to repudiate the contract under the act until mid-September, 2008.

The plaintiff contends that there is no requirement under *Walpole Woodworkers, Inc.*, that a contractor prove a "causal nexus" between the homeowner's conduct and the contractor's damages by showing that the homeowner fraudulently induced the contractor to provide goods and services. There is a requirement, however, that a contractor prove that the homeowner acted in bad faith. The mere fact that the contractor provided goods and services that the homeowner ultimately did not pay for, in and of itself, is not evidence of the homeowner's bad faith.

We emphasize that we do not conclude that the bad faith exception is applicable only to cases in which the homeowner accepted goods and ser-

vices from a contractor knowing that the act would provide an "escape hatch" and to cases in which the contractor has detrimentally relied on the homeowner's bad faith conduct in providing goods and services. To the contrary, we have expressly left open the possibility that a homeowner's repudiation of a contract on the basis of the contractor's technical noncompliance with the act, when the contractor has satisfactorily completed the work and his conduct has not given rise to any genuine dispute about the scope of the work or the contract price, may constitute bad faith under the act. See footnote 15 of this opinion. Moreover, we cannot rule out the possibility that there may be other forms of conduct that constitute bad faith under the act. We conclude only that the plaintiff in the present case has not established that the defendant's repudiation of the contract was in bad faith under the "escape hatch" theory, under the detrimental reliance theory, under the technical violation theory, or under any other theory. Although we recognize that this is a harsh result for the plaintiff, our role is to implement the intent of the legislature as embodied in the act, not to impose our own notion of justice.

[17] Although the trial court was free to discredit this evidence, any such disbelief would not support a finding that the defendant accepted goods and services from the plaintiff before August 4, 2008, with the intent not to pay for them. Cf. *State* v. *Alfonso*, 195 Conn. 624, 634, 490 A.2d 75 (1985) ("[w]hile it is true that it is within the province of the [fact finder] to accept or reject a defendant's testimony, a [fact finder] in rejecting such testimony cannot conclude that the opposite is true").

[18] Thus, although we assume the correctness of the trial court's finding that the defendant decided, "without a sound factual basis, that he would not pay for all of the time and materials expended on the project," we cannot conclude that that finding supports a finding of bad faith. The burden was not on the defendant to provide a sound factual basis for the amounts he paid to the plaintiff. Rather, under the act, the burden was on the plaintiff to provide written documentation, signed by both parties, for the amounts that he claimed were owing to him. Because the plaintiff's failure to comply with the act gave rise to a genuine dispute about the scope of the plaintiff's work and the amounts owed, the risk that the defendant would invoke the act to bar an enforcement action was on the plaintiff. Similarly, the trial court's findings that the defendant was profligate, that he was disinterested in managing the cost of the project, that, by repudiating the contract, he was serving his own financial interests at the plaintiff's expense, and that he lied to the plaintiff about representing himself if the plaintiff brought an action against him do not support a finding of bad faith under these circumstances because the act placed the burden of documenting contract changes on the plaintiff and the defendant had no duty to look out for the plaintiff's financial interests. See *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 38, 761 A.2d 1268 (2000) (party to arm's-length transaction is under no obligation to act for benefit of other party). Moreover, the plaintiff has provided no authority for the proposition that bluffing, in and of itself, constitutes fraud or bad faith. Cf. *Cook* v. *Little Caesar Enterprises, Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) (to constitute fraud, "allegedly false statements must relate to past or existing facts, not to future promises or expectations . . . [or] statements referr[ing] to events which might happen in the future" [citations omitted]). In the absence of a fiduciary duty, evidence of a party's profligacy, disinterest and self-interest does not constitute evidence of dishonesty or bad faith. See *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 38–39.

[19] The trial court found that the defendant had waived his right under the agreement to have all modifications set forth in a written change order signed by both parties by ordering the plaintiff to perform extra work. The court made this finding, however, in the portion of its memorandum of decision addressing and rejecting the defendant's counterclaim alleging that *the plaintiff* had breached the agreement. The court did not suggest that the defendant ever waived his right to invoke § 20-429 as a bar to the plaintiff's enforcement of the agreement. To the contrary, the trial court concluded that the agreement did not comply with § 20-429 and that it would be unenforceable in the absence of proof of bad faith.

[20] Although § 20-429 (a) does not expressly require contractors to reduce each change in the terms and conditions of the contract to a writing, signed by both parties, *before* the work that is the subject of the change is performed, this court has held that the purpose of the statute is to ensure that homeowners can make informed decisions as to whether to authorize additional work. See *Habetz* v. *Condon*, supra, 224 Conn. 239. Thus, if a contractor fails to

obtain written authorization from the homeowner for work before performing the work, the risk is on the contractor that the homeowner will refuse to sign a writing ratifying that the work was authorized and the contractor's claim for payment will, therefore, be unenforceable under the act, at least in the absence of proof of bad faith.

The dissent contends that the trial court never made a finding that the plaintiff's failure to comply with the act deprived the defendant of the opportunity to make informed decisions as to whether he should continue to accept goods and services from the defendant. There is no dispute, however, that the plaintiff failed to comply with the act. Nor is there any dispute that the core purpose of the act is to enable homeowners to make such informed decisions. See id. Accordingly, in the absence of proof of bad faith, the only possible conclusion is that the plaintiff's conduct deprived the defendant of his rights under the act.

[21] As we have indicated, the trial court found that the work was "largely complete" as of August 4, 2008, and 98 percent complete as of August 25, 2008. It is clear, therefore, that the plaintiff could not have performed a substantial amount of work after August 4, 2008. Indeed, the trial court expressly found that there was little risk to the defendant if he refused to make any further payments to the plaintiff after August 4, 2008, because the project was largely complete at that time and the defendant could easily hire another contractor to finish the work, which is what actually happened.

[22] We also note that the defendant included these items of extra work in his calculations showing that the total cost of the project was $963,923, while the defendant's payments totaled $985,000. Thus, when the defendant stated that he was prepared to accept these extras, but reserved the right to review whether the amounts were correct, he was essentially stating the he was reserving the right to *recoup* payments that he had already made to the plaintiff. Thus, it is difficult to understand how the plaintiff reasonably could have believed on the basis of this statement that the defendant was prepared to pay him *additional* amounts if he continued to work on the project.